IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| SAM BUDACH, on behalf of himself and all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | |
| ) | Case No. 2:14-cv-04324-NKL |
| v. ) ) | |
| NIBCO, INC., ) ) | |
| Defendant. ) | |

**ORDER**

Plaintiff Sam Budach, a homeowner, alleges that Defendant NIBCO, Inc.'s PEX plumbing system, which was installed in his home, failed and on multiple occasions caused water damage to the home. NIBCO moves for partial dismissal of the Amended Complaint [Doc. 53]. For the reasons discussed below, the motion is granted in part and denied in part.

**I.    Background[1]**

NIBCO manufactures and sells plumbing products across the United States, including a line of cross-linked polyethylene (PEX) tubes, brass fittings, and steel clamps. Together, these PEX Products are used to construct residential and commercial plumbing systems.

The PEX Products are defective. PEX Tubing exhibits "slow growth cracking mechanisms consistent with oxidative failure," which is caused by "insufficient stabilization and/or improper cross-linking of the PEX material used by NIBCO." [Doc. 47, pp. 12-13, ¶ 51]. Furthermore, because they were defectively manufactured and designed, both the PEX Fittings and PEX Clamps are susceptible to corrosion—the Fittings because of dezincification and the

---

[1] These facts appear in Budach's Amended Complaint [Doc. 47]. For purposes of deciding NIBCO's motion to dismiss, the Court accepts Budach's factual allegations as true and construes them in the light most favorable to Budach. *See Stodghill v. Wellston Sch. Dist.*, 512F.3d 472, 476 (8th Cir. 2008).

Clamps because of chloride-induced stress. Corrosion causes "cracking and leaking," and the "water leaks … have and will cause extensive damage to homes, businesses and personal property." [*Id.*, p. 15, ¶ 54]. NIBCO knew or should have known that the PEX Products are exposed to elements that cause corrosion in the course of their foreseeable and intended use. Yet NIBCO manufactured its PEX Clamps from a stainless steel alloy known to corrode in the presence of chlorides, compounds routinely found in building construction.

NIBCO thus also "knew or should have known that the PEX Products were not suitable for uses within water-carrying plumbing systems." [*Id.*, p. 3, ¶ 9]. Nevertheless, NIBCO advertised its PEX Tubing as "the highest quality PEX tubing available" with a "cross chemical bonding process [that] gave it 'superior characteristics.'" [*Id.*, p. 2, ¶ 4]. NIBCO also expressly warranted that its PEX Tubing would be free from defects for 10 years. If the plumbing system was installed by a licensed professional contractor using only NIBCO products, *i.e.*, the PEX Fittings and Clamps, the warranty extended to 25 years.

The express warranty states in part:

> NIBCO Inc. warrants that when NIBCO® PEX tube is used with NIBCO® PEX fittings, and NIBCO® valves and installation accessories, they will, under normal conditions, use and service in potable water and radiant heat systems, be free from defects in materials and workmanship for a period of twenty-five (25) years from the date of purchase when installed by a licensed professional contractor. This 25-year warranty is voided if any non-NIBCO products are used in the PEX system. NIBCO INC. warrants NIBCO PEX tube, when used under normal conditions, use and service in potable water and radiant heat systems with brass insert fittings meeting NSF/ANSI 61, ASTM F1807 and ASTM F877 to be free from defects in materials and workmanship for a period ten (10) years from the date of purchase. NIBCO INC. warrants NIBCO® associated hardware and tools for a period of 90 days from the date of purchase.
>
> In the event any defect occurs which the owner believes is covered by this warranty, the owner should immediately contact NIBCO
2

> Technical Services, either in writing or by telephone at 1.888.446.4226 or 1.574.295.3000. The owner will be instructed to return said tube, fittings or accessories, at the owner's expense, to NIBCO INC., or an authorized representative for inspection. In the event said inspection discloses to the satisfaction of NIBCO INC. that said tube, fitting or accessory is defective, a replacement shall be mailed free of charge to the owner.
>
> **IN ORDER FOR THIS LIMITED WARRANTY TO APPLY, THE ABOVE REFERENCED PRODUCTS MUST BE INSTALLED BY A LICENSED PROFESSIONAL PLUMBER IN ACCORDANCE WITH NIBCO INSTALLATION INSTRUCTIONS AND IN COMPLIANCE WITH ALL APPLICABLE CODE REQUIREMENTS. FAILURE TO DO SO WILL VOID ALL APPLICABLE WARRANTIES.**

[Doc. 25-1, p. 2] (emphasis in original).

When his house was built in 2006, Budach's general contractor used a licensed professional plumbing contractor to install the plumbing system, which was built entirely with NIBCO's PEX Products. Budach then moved into the house and used it as his primary residence. Beginning in January 2012, the plumbing system suffered a series of leaks, causing damage to the home. First Budach noticed water pooling near the master bathroom and hired a licensed plumber to repair the leak. In August 2013, he then observed pools of water at the base of his wall and a year later, in August 2014, he noticed water seeping into the kitchen. A licensed plumber investigated each incident, determined there was a leak in Budach's NIBCO plumbing system, and repaired the leak. Around August 20, 2014, Budach heard a hissing sound in a wall of the home and turned off the water. After cutting through portions of the wall to investigate, a licensed plumber again determined there was a leak in Budach's plumbing system. Budach paid the plumber to repair the leak and hired a licensed contractor to replace portions of his damaged wall and cabinets.

Each leak was caused by a failed PEX Fitting. Yet even though the PEX Products were

3

defective", NIBCO "failed to fulfill its obligation to replace the defective PEX Tubing and compensate [Budach] for the foreseeable property damage it caused." [*Id*., p. 13, ¶ 53].

Budach's original Complaint [Doc. 1] contained seven counts: Breach of Express Warranty, Breach of Implied Warranty of Merchantability, Breach of Implied Warranty of Fitness for a Particular Purpose, Negligence, Violation of the Missouri Merchandising Practices Act (MMPA), Unjust Enrichment, and Declaratory and Injunctive Relief. NIBCO moved to dismiss all claims [Doc. 24] and the Court granted the motion in part and denied it in part [Doc. 44]. The Court dismissed without prejudice the counts for Breach of Express Warranty, Breach of Implied Warranty of Merchantability, Breach of Implied Warranty of Fitness for a Particular Purpose, and Violation of the Missouri Merchandising Practices Act. The Court dismissed with prejudice the count for Unjust Enrichment. The Court also dismissed the portion of the count for Negligence that sought recovery of repair or replacement costs for PEX Products, because it was barred by the economic loss doctrine. Finally, the Court dismissed the claim for Injunctive Relief. The Court granted Budach leave to file an amended complaint consistent with the dismissal order.

Budach filed his Amended Complaint, which contains five counts:

I. Breach of Express Warranty
II. Breach of Implied Warranty of Merchantability
III. Negligence
IV. Violation of the Missouri Merchandising Practices Act (MMPA)
V. Declaratory Relief

**II. Discussion**

NIBCO argues that Budach asserted nothing new with respect to certain claims contained in the Amended Complaint, and that the Court should therefore dismiss them, specifically, the warranty claims, MMPA claim, and negligence claim to the extent that it is barred by the

4

economic loss doctrine. Although the Court permitted Budach leave to amend, these claims must again be dismissed if he has failed to plead facts that, taken as true, facially support a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009).

> **A. Count I, Breach of Express Warranty; Count II, Breach of Implied Warranty of Merchantability**

In its previous Order, the Court dismissed Budach's warranty claims because "Budach admitted at oral argument that he did not provide pre-suit notice" of breach before asserting the claims. [Doc. 44, p. 6]. NIBCO argues that Budach's warranty claims must again be dismissed because Budach's Amended Complaint still does not allege that he provided appropriate pre-suit notice of breach.

Section 2-607 of the Uniform Commercial Code, as adopted by Missouri, provides that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Mo. Rev. Stat. § 400.2-607(3)(a)). Budach alleges that he "provided notice of his breach of warranty claims to [NIBCO] through the filing and serving of his complaint on December 11, 2014." [Doc. 47, p. 6, ¶ 34]. He argues that such notice is sufficient, because § 400.2-607(3)(a) does not state that notice must precede the filing of a lawsuit.

Jurisdictions disagree as to whether U.C.C. 2-607 mandates pre-suit notice. *See In re Bridgestone/Firestone, Inc. Tires Products Liab. Litig.*, 155 F. Supp. 2d 1069, 1110 (S.D. Ind. 2001), *reversed in part on other grounds*, 288 F.3d 1012 (7th Cir. 2002) ("Courts vary widely in their interpretations of § 2–607(3)(a). For example, some courts have held, with varying degrees of analysis, that the filing of a lawsuit can, at least in some instances, satisfy the notice of breach requirement. Other courts have reached the opposite conclusion.") (internal citations omitted).

5

Missouri courts have not taken a position on this issue.[2] As such, the Court has considered the approaches taken by other jurisdictions, and for the following reasons finds more persuasive those jurisdictions that require a plaintiff provide some minimal notice before filing a lawsuit.

First, courts requiring pre-suit notice have emphasized that the purposes of Section 2-607 are best satisfied when a plaintiff provides pre-litigation notice of breach. *See, e.g., Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 866 (D. Minn. 2012) (applying Indiana law); *Hepper v. Triple U Enterprises, Inc.*, 388 N.W.2d 525, 529 (S.D. 1986) (applying South Dakota law). The provision's purposes are "to effect a cure, or to facilitate an effort to negotiate a settlement, or to gather and preserve evidence for possible litigation." PEB Study Group, Uniform Commercial Code Article 2: Preliminary Report 167 (1990). Other purposes include "prevent[ing] stale claims," *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 369 (Mo. banc 1993), and "defeat[ing] commercial bad faith," *N. States Power Co. v. ITT Meyer Indus., Div. of ITT Grinnell Corp.*, 777 F.2d 405, 409 (8th Cir. 1985). Courts have observed that the spirit of these purposes, taken together, promotes the resolution of warranty issues outside of the adversarial judicial process. *See, e.g., Kerr v. Hunter Div.*, 1981 WL 394232 (Va. Cir. Feb. 23, 1981) (The giving of a summons and complaint "is hardly within the spirit of . . . the Uniform Commercial Code requirement of the giving of timely notice."). Most importantly, this position reflects the majority view. *See., e.g.*, 18 Williston on Contracts § 52:42 (4th ed.) ("[T]he fact that the buyer has filed an action seeking damages for the breach of warranty has not been regarded as

---

[2] NIBCO cites *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 979 (S.D. Cal. 2014), for the proposition that Missouri law "requires a buyer to provide notice to the seller before bringing a breach of warranty claim." The court in *In re Sony Gaming Networks* cited a Missouri case, *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 130 (Mo. 2010) (en banc). While the Missouri Supreme Court held that the plaintiffs could not maintain their breach of warranty claims, the court did not discuss the notice provision.

6

tantamount to the statutory notice.").

Second, the history of Section 2-607 indicates that its drafters intended the provision to require pre-suit notice. Section 2-607 is largely based on Section 49 of the Uniform Sales Act, which provided that "[i]f, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor." Uniform Sales Act § 69-449. Section 49 of the Uniform Sales Act, in turn, was interpreted by most courts to require pre-suit notice. George Frank Hammond, *Notification of Breach Under Uniform Commercial Code Section 2-607(3)(a): A Conflict, a Resolution*, 70 Cornell L. Rev. 525, 529 (1985) (citing cases). *See also American Mfg. Co. v. United States Shipping Board E.F. Corp.*, 7 F.2d 565, 566 (2d Cir. 1925) (Learned Hand, J.) ("The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning."). Presumably aware of this precedent, the drafters of Section 2-607 envisioned "continu[ing] the prior basic policies with respect to acceptance of goods while making a number of minor though material changes in the interest of simplicity and commercial convenience." U.C.C. § 2-607 Official Comment. Commentators have read this language to indicate that Section 2-607 did not seek to displace or significantly alter Section 49. Patrick A. Milberger, *Section 2-607(3)(a): Effective Notification of Breach Under the Uniform Commercial Code*, 44 U. Pitt. L. Rev. 733, 735 (1983).

The Court recognizes that under these circumstances the pre-notice requirement is largely unfair. Also, given the substantial resources devoted by courts today to early settlement of lawsuits, the pre-notice requirement is more a trap than a meaningful tool to avoid protracted litigation. However, those are issues for the legislatures to address. The Court cannot fairly say

7

that either the legislature or the Uniform Commissioners envisioned a lawsuit being the notice contemplated by the U.C.C.

Consequently, the Court concludes that a plaintiff must provide some minimal pre-suit notice of breach in order to assert a warranty claim under Section 2-607(3)(a) of the U.C.C. and Section 400.2-607(3)(a)) of Missouri's commercial code. Budach did not do so.

Budach stated at oral argument that such notice could not have remedied the plumbing issue, because NIBCO would merely have replaced defective PEX Products with other defective PEX Products. But that issue goes to the merits of the warranty claim. Before that issue is reached, the notice requirement must be satisfied.

Budach alternatively argues that "[p]re-suit notice was not required as [NIBCO] was aware or should have been aware of the defect in the PEX Products no later than December 27, 2013, when a lawsuit with similar allegations regarding the defects in PEX Products was filed in the United States District Court, District of New Jersey." [Doc. 47, pp. 20-21, ¶ 88]. Yet Section 400.2-607(3)(a) expressly states that "*the buyer* must . . . notify the seller" (emphasis added). As such, notice is not simply an event that must occur prior to litigation. Rather it is an obligation that the buyer himself carries. *See Keene*, 855 S.W.2d at 369 ("the buyer is [] under a duty to notify the immediate seller"). Budach did not satisfy this obligation.

Accordingly, just as Budach's original Complaint failed to allege that he provided notice of NIBCO's breach, so too does his Amended Complaint fail to correct this deficiency. Count I and Count II are therefore dismissed with prejudice.

### B.    Count IV, Violation of the MMPA

NIBCO argues that the MMPA claim must again be dismissed for failing to satisfy the Federal Rule of Civil Procedure 9(b) pleading standard. Under Rule 9(b), when alleging fraud, a

plaintiff must "state with particularity the circumstances constituting fraud or mistake." Therefore the MMPA, a consumer fraud statute, requires plaintiffs to allege the "time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001). Alternatively, a plaintiff claiming fraudulent omission under the MMPA must show the defendant failed to disclose material facts that were "*known to him/her,* or upon reasonable inquiry *would [have been] known to him/her.*" *Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009) (citations omitted) (emphasis in original).

The Court previously dismissed Budach's MMPA claim because he did not "allege with specificity the time and place of the conduct complained of, the content omitted, the identity of the person who omitted it, and what was obtained or given up thereby." [Doc. 44, p. 12]. The Court also dismissed his claim for omission of a material fact under the MMPA because "Budach [did] not specifically allege when and how NIBCO became aware of [alleged defects], or should have become aware of them." [*Id.*, p. 13].

> Budach added one factual allegation relating to fraud to the Amended Complaint:
>
>> Additionally, NIBCO knows or should have known that chlorides from any source would be problematic for the stainless steel PEX Clamps. NIBCO acknowledges that their PEX Clamps are "covered by international patents held by Oetiker International." Oetiker warns that chloride-rich environments can be problematic for their PEX Clamps. NIBCO fails to disclos[e] these vulnerabilities.

[Doc. 47, p. 27, ¶ 123]. This allegation relates only to the PEX Clamps, and Budach has still failed to specifically allege when and how NIBCO became aware of the alleged defect, or by what date it should have known of the defects. Thus, Budach fails to satisfy Rule 9(b)'s pleading standard.

Therefore, Count IV is dismissed without prejudice.

## C. Count III, Negligence

NIBCO argues that Budach's negligence claim is partially barred by the economic loss doctrine. The Court previously dismissed this claim "[t]o the extent Budach seeks to recover the cost of repairing or replacing the NIBCO PEX products." [Doc. 44, p. 9.]

NIBCO points out that the Amended Complaint again includes "the cost of repairing and replacing the PEX Products" in asserting the damages that NIBCO's alleged negligence caused. [Doc. 47, p. 23, ¶ 103]. In response to NIBCO's motion, Budach "acknowledges that his negligence claim is limited by the economic loss doctrine to damages caused by the failure of the NIBCO PEX Products to property other than the NIBCO PEX Products." [Doc. 62, p. 14].

But NIBCO further argues that Budach cannot maintain "any negligence claim over PEX Tubing and PEX Clamps because he does not allege that any PEX Tubing or Clamp installed in his home has failed." [Doc. 54, pp. 19-20]. As the Amended Complaint reflects, Budach simply claims negligence regarding "the PEX Products." [Doc. 47, p. 22, ¶ 100]. The PEX Products, taken together, are component parts of Budach's failed plumbing system, and the failure of a component part can form the basis of a negligence claim as to the system as a whole. *See, e.g.*, *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 373 (Mo. 1986) (upholding a jury verdict that found two flight components were negligently designed and manufactured, contributing to a plane crash); *Chubb Grp. of Ins. Companies v. C.F. Murphy & Associates, Inc.*, 656 S.W.2d 766, 775 (Mo. Ct. App. 1983) (denying a motion to dismiss a negligence claim that alleged, in part, that defects in several component parts of a roof caused that roof to collapse). Neither the plaintiffs in *Nesselrode* nor *Chubb* claimed that each component part of the plane or roof, respectively, had failed. Rather they argued that *some* parts were defective and failed, and

10

thus the ultimate injuries—the roof collapse and plane crash—were necessarily the result of negligent manufacture and assembly of the system as a whole.

Similarly here, Budach pleads that the injury he suffered—failure of his plumbing system—was the result of NIBCO's negligent "workmanship," "manufacture," and "test[ing]" regarding the PEX plumbing system as a whole. [Doc. 47, pp. 22-23, ¶ 101]. As the Court explained in its previous Order,

> [Budach] alleged the plumbing system did not do what a residential plumbing system is supposed to do—carry water throughout his home without allowing it to leak into places where it was not supposed to go. He further alleged NIBCO failed to use ordinary care, and that he was thereby damaged. The allegations are sufficient to apprise NIBCO of what Budach's claims are, and state a plausible claim for relief under Missouri law.

[Doc. 44, pp. 8-9]. Budach's inability or failure to specifically allege failures in the PEX Tubing and PEX Clamps does not narrow the negligence claim as NIBCO suggests.

Count III is dismissed with prejudice to the extent Budach seeks recovery for repair or replacement of any of the PEX Products. In all other respects, NIBCO's motion to dismiss Count III is denied.

### III. Conclusion

For the forgoing reasons, NIBCO's motion to dismiss is granted in part and denied in part, as follows:

- Count I (Breach of Express Warranty), and Count II (Breach of Implied Warranty of Merchantability), are dismissed with prejudice.

- Count IV (violation of the MMPA) is dismissed without prejudice.

- Count III (Negligence) is dismissed with prejudice to the extent Budach seeks recovery for repair or replacement of any of the PEX Products. In all other

11

Case 2:14-cv-04324-NKL   Document 78   Filed 11/06/15   Page 11 of 12

respects, NIBCO's Motion to Dismiss Count III is denied.

          s/ Nanette K. Laughrey
          NANETTE K. LAUGHREY
          United States District Judge

Dated: November 6, 2015
Jefferson City, Missouri